**Peter M. Lacy ("Mac") (OSB # 01322)**
Oregon Natural Desert Association
917 SW Oak Street, Suite 419
Portland, OR 97205
(503) 525-0193
lacy@onda.org

**Lauren M. Rule (OSB # 015174)**
Advocates for the West
3115 NE Sandy Blvd., Suite 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**BRENDAN CAIN**, Burns District Manager, BLM, *et al.*,<br><br>　　　　　　Defendants. | Case No. 2:12-cv-1551-PK<br><br>**[PROPOSED] SURREPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The Oregon Natural Desert Association ("ONDA") submits this surreply brief to address new factual assertions raised for the first time in defendants' ("BLM") reply briefs (Dkt ## 54, 55) and two new extra-record declarations (Dkt ## 56, 57).

## ARGUMENT

### I. GREATER SAGE-GROUSE ISSUES

#### A. Active Versus Inactive Sage-Grouse Leks

Attempting to downplay significant effects to sage-grouse, BLM argues for the first time in its summary judgment reply papers that Dr. Miller's spatial analysis is "unreliable" based on the agency's claim that "many" of the leks at issue are "inactive." *See* BLM MSJ Reply at 28 (citing Second Daniels Decl. ¶¶ 4–5). BLM fails to explain in its brief what this term actually means or to provide any data to support it—and its wildlife biologist's explanation is incomplete at best. Among other things, he fails even to disclose which leks he believes are not active.

"Active" and "inactive" are defined technical terms for sage-grouse breeding areas. In general, leks are sometimes classified as active or inactive depending upon how many male sage-grouse observers document attending the lek during the breeding season in one or more years. *See, e.g.*, AR 2150 (the Oregon Department of Fish and Wildlife's ("ODFW") 2011 *Sage-Grouse Strategy*, defining an inactive lek as one "with sufficient survey data to suggest that there was no male attendance throughout a breeding season"). The ODFW uses the terms active and inactive with respect to single-season descriptions; by contrast, it uses the terms "occupied" and "unoccupied" to describe lek status over time. *See* AR 2150–51 (defining an unoccupied lek as one "that has been counted annually and has had ZERO birds for eight or more consecutive years"); *see also* AR 2151 (also distinguishing a "historic lek" as one "that has been unoccupied prior to 1980 and remains so").

Here, BLM does not reveal which leks it claims are "inactive" or "pending unoccupied" or "historic." BLM cites no information in the record as to how much survey data has been

collected on these leks. And even if it is using the term correctly, under ODFW's terminology, an "inactive" lek has only been unattended by *males* for a *single* breeding season. This Court should not defer to the opinions of BLM's biologist when those opinions are not adequately explained or supported by any data. *W. Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 493 (9th Cir. 2011) (rejecting unsupported assertions of agency about effects of project where there was no corroborating evidence); *Wild W. Inst. v. Bull,* 547 F.3d 1162, 1174 n.6 (9th Cir. 2008) (NEPA requires that agency disclose hard data supporting its expert opinions); *Sierra Club v. Bosworth,* 510 F.3d 1016, 1023, 1026 (9th Cir. 2007) (agency must adequately explain and support decision to use a CX; it cannot simply assert there will be no significant effects).

Further, leks are mating grounds, representing just one of the sage-grouse's several unique seasonal habitats. Sage-grouse hens establish nests up to 20 km (12.5 mi.) from a lek, AR 4557—a far greater distance than the conservative 3-mile buffer around leks Dr. Miller applies on several of his maps—and the birds use habitat miles away from leks for other life activities. AR 4558–60, 4566–67. "Large seasonal and annual movements emphasize the landscape nature of the greater sage-grouse." AR 4559.[1] Thus, leks are only a small proportion of the habitat

---

[1] BLM also takes issue with Dr. Miller's 3-mile buffer, but fails to cite any authority that would undermine it. The record makes clear that three miles is a conservative number. The connectivity analyses of Knick and Hanser in the Monograph (AR 15189–260) are especially noteworthy. In their study, they calculated distance thresholds that potentially isolate populations—*i.e.*, habitat connectivity must be sufficient to enable birds to disperse at significant distances—and an understanding of how landscape pattern, environmental disturbance, and location influence persistence and extirpation of leks. Their analysis of connectivity and lek persistence was based on more than 5,000 leks, and analysis of landscape patterns at distances of 3.1 miles, 11.2 miles, and 33.5 miles (5, 18, and 54 km, respectively) from leks. They found that the most significant spatial scales for environmental predictors of lek persistence or abandonment were proportion of sagebrush cover within 33.5 miles of the lek, proportion of burned area within 33.5 miles of the lek, and—critical to this case—level of human footprint within 3.1 miles of the lek. AR 15211, 15216, 15219; *see also* ONDA MSJ Reply at 4–5 (discussing the "human footprint" model of studying effects of anthropogenic disturbance on sage-grouse). That BLM is "unaware of any scientific basis" for a 3-mile lek buffer, Second Daniels Decl. ¶ 7, therefore is disturbing.

necessary to sustain sage-grouse, and adverse impacts to other habitat features can be just as detrimental for the species.

In short, an inactive or unoccupied lek does not equate to a finding that an area is devoid of any sage-grouse. Neither does it absolve BLM of its obligation to study effects to sage-grouse habitats other than those BLM describes as proximate to "active" leks. *See* BLM Reply Br. at 28. If anything, the presence of nearby "inactive" or "unoccupied" leks suggests that the areas that will be fragmented by mechanically maintained roads once supported a larger population of sage-grouse that used these areas—and thus heightens the environmental concern here. *See* ONDA MSJ Reply at 3–5 (summarizing the negative effects of roads with respect to sage-grouse populations and habitat requirements). Further degradation of these areas will only cause further declines of sage-grouse rather than help to restore them.

In fact, sage-grouse in disturbed areas (like mechanically maintained roadways and adjacent habitats susceptible to weed infestations) have a substantially reduced likelihood of reproductive success. AR 4557–58 (average nest success for sage-grouse drops from already low 51% in non-disturbed habitat to 37% in disturbed habitat). In the edge habitats BLM is talking about, a small additional population decrease can cause permanent abandonment of nearby leks and the loss of their unique genetic resources. *See, e.g.*, AR 4600–04 (USFWS projecting that sage-grouse will decline substantially toward extinction in the foreseeable future if continued habitat degradation in existing sage-grouse areas continues); AR 2811 ("Sage-grouse are slow to recolonize disturbed areas even though structural features of the shrub community may have recovered"); AR 15286 ("Viable sage-grouse populations require large landscapes, so fragmentation resulting even from scattered disturbances may lead to disproportionate

populations declines or regional extinctions") (internal citation omitted); AR 15192 ("Protecting [1] core regions and [2] maintaining connectivity with more isolated sage-grouse populations may help reverse or stabilize the processes of range contraction and isolation that have resulted in long-term population declines"); AR 4648 ("Isolated populations are typically at greater risk of extinction due to genetic and demographic concerns such as inbreeding depression, loss of genetic diversity, and Allee effect (the difficulty of individuals finding one another)"). BLM has provided no factual or legal ground as to why fragmentation of non-pristine or edge habitat does not pose a substantial environmental risk.

Because sage-grouse in the project area already are struggling, including as evidenced by inactive or unoccupied leks in the area if one takes BLM's statements at face value, then additional, cumulative harm from maintaining primitive or nonexistent routes across this landscape threatens *greater*, not lesser, adverse effects. That supports ONDA's contention that BLM was wrong to categorically exclude the maintenance from a full environmental review, was wrong to segment related projects into smaller parts, and was wrong to not prepare an EIS. It also supports ONDA's argument that BLM was wrong not to follow its land use plan directives prioritizing conservation of special status sage-grouse over other, competing activities.

### B. Effects of Secondary Roads on Sage-Grouse

BLM persists with its scientifically unsupported contention that secondary roads do not affect sage-grouse, *see* BLM MSJ Reply at 22, 25, 29, 34, 40, now offering additional declaration testimony from its biologist. Second Daniels Decl. ¶ 9. Yet, the only authority the agency cites for this proposition is a single phrase from the Monograph stating that "the presence of secondary roads appeared not to influence lek trends." AR 15277. There are two problems with the blanket conclusion BLM draws from this isolated statement.

First, BLM fails to disclose that the authors of that Monograph chapter go on to state that the sage-grouse at issue in this case—those within the Northern Great Basin Sage-grouse Management Zone—are the one exception to the statement relied upon by BLM: "Distance to nearest road of any type appeared related to lek trends *only* in the Northern Great Basin [SMZ], where higher trends were associated with greater distances to a road." AR 15277 (emphasis added). In other words, for the sage-grouse at issue here, an increase in leks was correlated with longer distances from any type of road—including secondary roads.

Second, even if it was true that secondary roads did not influence *lek* trends, leks are mating areas that represent but one of the sage-grouse's unique seasonal habitats. The record is replete with information explaining how roads—including secondary or primitive roads—negatively affect sage-grouse populations and their critical nesting, brood-rearing, migratory, and winter habitats—and do so at considerable spatial scales. *See* ONDA MSJ Reply at 18–20, 25 (discussing why BLM was arbitrary not to study impacts of its route maintenance project in any biologically-relevant way); *id.* at 3–5 (summarizing findings concerning negative impacts from roads—including secondary or primitive roads—drawn from USFWS, ODFW, leading sage-grouse expert Dr. David Dobkin, and BLM's National Technical Team of experts).

**C. Sage-Grouse Connectivity**

BLM's biologist claims there is no connectivity corridor on northern Steens Mountain. Second Daniels Decl. ¶¶ 10–11. This statement not only shows a misunderstanding of what a connectivity corridor is, but also contradicts information from ODFW showing "seasonal" and "local" connectivity in the precise areas highlighted by Dr. Miller.

Mr. Daniels claims the area shown on Dr. Miller's Map 24 (Dkt # 49-8) is merely "a mixture primarily of negligible, low, and moderate habitat viability," and therefore presumably

cannot be a connectivity corridor. Second Daniels Decl. ¶ 10. However, connectivity analysis is a way of understanding how habitats influence animal movements. *See* AR 15194. "If animals are sensitive to arrangement of their habitat and if we can describe that relationship, we can understand how landscapes influence individuals or populations in daily and seasonal movements, how they disperse to new locations from natal ranges, and gene flow." AR 15195; *see generally* AR 15190–261 (Monograph chapter focused on connectivity); AR 2089–90 (ODFW's description of its use of connectivity analysis to map important habitats as part of its "core areas" framework).

Mr. Daniels says that because the area highlighted by Dr. Miller is not outstanding sage-grouse habitat, it cannot be a connectivity corridor. Second Daniels Decl. ¶ 10. But connectivity means *connecting* important habitat areas. AR 15195. Sage-grouse experts identify connectivity corridors through GIS analysis by "linking" clusters of leks according to what we know about sage-grouse dispersal, seasonal movements, and the main factors associated with lek abandonment. AR 15196, 15204–11. As ODFW notes, connectivity maps "DO NOT describe the habitat condition with respect to understory structure and composition" of sagebrush in the corridor itself. AR 2063. In other words, sage-grouse using breeding areas separated by a marginal habitat area may nevertheless rely upon that intermediate marginal habitat as an important corridor they use to disperse and keep resident populations viable. *See, e.g.*, AR 2018 ("Connectivity promotes genetic exchange and reduces complications that may arise from inbreeding"); AR 15007 ("Migratory corridors are generally defined by the relationship between habitat configuration and seasonal movements and habitat requirements of sage-grouse"). "Protecting core regions and maintaining connectivity with more isolated sage-grouse populations may help reverse or stabilize the processes of range contraction and isolation that

have resulted in long-term population declines." AR 15192; *see also* AR 2012 ("Maintenance of connectivity and reduction of fragmentation of sagebrush habitats is key to the long-term welfare of all these sagebrush associated species").

Thus, as Dr. Miller explains, the sage-grouse connectivity corridor on north Steens Mountain, through which slice a dozen or so of BLM's routes approved for maintenance, contains multiple active leks *and* connects two essential Core areas at either end, as depicted by the underlying ODFW data. *See* Second Miller Decl. ¶ 45 & Map 24. The blue dashed lines on Dr. Miller's map thus *highlight* the connectivity corridor that ODFW identifies in its Figure 26 (AR 2102), which shows light gray (Seasonal Connectivity) as well as a cluster of sage-grouse leks between two dark gray (Local Connectivity) regions in the precise location Dr. Miller highlights with his blue dashed lines. BLM's contention that there is no connectivity corridor lacks any scientific basis in fact and is contrary to conclusions drawn by ODFW.

## II. GEOGRAPHIC INFORMATION SYSTEM ISSUES

BLM continues to push its "mystery data" theme by providing a new declaration from its GIS specialist. The agency contends Dr. Miller's work is "unreliable" and states it is "unable" to "evaluate the accuracy" of his analyses. *See* BLM MSJ Reply at 28; BLM Strike Reply at 6, 7, 9, 10–11; Second Keller Decl. ¶¶ 3–11. That argument proves too much.

As Dr. Miller explained, he used *BLM's own data*, as well as easily obtainable data from the ODFW and the United States Department of Agriculture's National Agriculture Imagery Program ("NAIP"), to prepare his spatial analyses. Miller Decl. ¶¶ 19–20, 28; Second Miller Decl. ¶¶ 2, 17–25, 27–30, 41–43, 45–47. If BLM thinks Dr. Miller's numbers are off, the agency could have submitted its own. That it did not is telling.

For example, Ms. Keller questions whether the correct mileage of routes already maintained within Core sage-grouse habitat is 118 miles or 112 miles. Second Keller Decl. ¶ 9. As a GIS specialist, presumably she is able to conduct her own analysis derived from two data sets that should be in BLM's possession: the location and extent of ODFW-identified Core sage-grouse habitat, and BLM's own data on which of the CX routes it has and has not yet maintained. But BLM declines to offer or disclose any such numbers. One suspects the reason is that the agency's numbers would not differ in any meaningful way from ONDA's; for if they did, surely BLM would have provided any such competing numbers or spatial analyses to the Court. Whether the actual miles are 112, 118, or somewhere in between is not relevant to the fact that a very large number of CX route miles are within Core sage-grouse habitat—habitat that, according to the ODFW, is "essential for greater sage-grouse populations" and that is "irreplaceable." AR 2094.

Moreover, the fact that Ms. Keller is questioning the accuracy of Mr. Miller's analysis without producing her own analysis of maintained route mileage within Core sage-grouse habitat shows that BLM did not conduct such an analysis. This failure is the crux of the plaintiff's claim: BLM had the burden to demonstrate that its actions would have no significant individual or cumulative effects to forego NEPA analysis here. By failing to undertake such a critical analysis as that performed by Dr. Miller, BLM has not met that burden.

Indeed, the administrative record itself shows that mechanically maintaining well over 500 miles of mostly primitive routes may have significant effects on the environment, which precludes use of a CX. If this case was about fixing potholes or removing rock slides here and there, the answer might be different. But it is not. As emphasized in ONDA's earlier briefs, the CXs on their face authorize using heavy equipment to accomplish far more significant work

including "continuous" surface blading, continuous roadside vegetation removal, grading, graveling, and construction of new culverts and rock crossings through streambeds. AR 1, 175, 1830, 1977, 1982, 4690; *see also* ONDA MSJ Reply at 3–5, 8–9, 13–23 (discussing the project's significant environmental effects in detail—not just with respect to creating new roads but also with respect to maintaining the presence of existing roads).

### III. STANDING ISSUES

In its opening brief, BLM argued in general terms that ONDA had not established a sufficiently site-specific geographic nexus to establish standing. *See* BLM MSJ Br. at 24. On reply, the agency attempts to broaden its argument by now urging that Dr. Miller needs to have actually traveled on routes authorized for maintenance under each of the six CX decisions at issue. BLM MSJ Reply at 4–5, 8. The agency provides new declaration testimony from its GIS specialist claiming that Dr. Miller "has personally visited roads covered by just two of the six CX decisions." Second Keller Decl. ¶ 12. BLM's newly articulated legal argument is incorrect as a matter of law, and the agency's new declaration testimony misses the point of leading cases dealing with geographically widespread projects like the one at issue here.

> To satisfy Article III's standing requirements, a plaintiff must show
>
> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). In addition to these constitutional requirements, a plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA must show that its alleged injury falls within the "zone of interests" that NEPA was designed to protect. *Douglas County v. Babbitt*, 48 F.3d 1495, 1499 (9th Cir. 1995). BLM does not dispute that ONDA has satisfied this prudential standing requirement.

ONDA's interests in conserving sagebrush habitat and preventing adverse environmental effects from BLM's proposed route maintenance fall squarely within the zone of interests protected by NEPA. *See, e.g.*, 42 U.S.C. § 4331(b)(4) (noting congressional purpose to "preserve important historic, cultural, and natural aspects of our national heritage").

ONDA has demonstrated a sufficiently concrete interest to establish an injury in fact under the test set forth in *Laidlaw*. For example, the complaint alleges that ONDA's members and staff use and enjoy the public lands that are the subject of the challenged agency decisions. First Amended Compl. (Dkt # 14) ¶¶ 10–11; *see also id*. ¶¶ 34–37 (describing how ONDA has inventoried and documented wilderness and other environmental values within more than 30 roadless areas covering more 1.2 million acres of public land on the Burns District, which overlap the areas affected by the CX decisions at issue).

Further, Dr. Miller, an ONDA member, has on several occasions, both before and after issuance of the challenged decisions, visited the areas in and around all six project areas to observe the Greater sage-grouse and its habitat. Miller Decl. ¶¶ 3–5, 7, 11, 14; Second Miller Decl. ¶¶ 3–8. Dr. Miller explains that the removal or fragmentation of the sage-grouse's habitat would directly affect his interest in and appreciation of sage-grouse populations and habitats, and his ability to enjoy these public lands. *See especially* Miller Decl. ¶¶ 11–12; Second Miller Decl. ¶¶ 3, 7. In particular, Dr. Miller explains that he is concerned "not merely about the substantial footprint of disturbed roadways, but more fundamentally about the well-known effects of maintaining (or creating) these roads within otherwise unroaded sagebrush landscapes and habitats." Second Miller Decl. ¶ 7. And Dr. Miller explains that he intends to continue to visit routes and areas at issue in all six of the challenged CXs, starting with concrete plans this fall. Miller Decl. ¶¶ 3–5, 7; Second Miller Decl. ¶¶ 3–4, 6, 8.

Page 12 of 14

This is more than enough to satisfy ONDA's requirement that it demonstrate standing to challenge the CX decisions. BLM's newly fleshed out argument—that Dr. Miller must show that he has actually driven on routes authorized under each CX decision—lacks a leg to stand upon. *See, e.g.*, *Laidlaw*, 528 U.S. at 182 (*not* requiring that actual use of the river by swimming, wading, or boating was necessary to establish standing, and drawing no distinction between such activities and enjoying the river from the surrounding land by hiking, camping, picnicking, and driving near the river); *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001) ("If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact"); *W. Land Exch. Project v. U.S. Bureau of Land Mgmt.*, 315 F. Supp. 2d 1068, 1078 (D. Nev. 2004) (although the areas used by plaintiffs were "geographically distant from the lands" at issue in a proposed BLM land exchange, the plaintiffs' "substantive allegations, however, concern not only the likely development of [to-be-exchanged] lands and resulting transformation of that property, but also the potential wide-ranging effects of that development on hydrology throughout the region"). Dr. Miller's declarations are more than enough to demonstrate a sufficient geographic nexus between the challenged route maintenance activities and the areas he uses to observe sage-grouse and sage-grouse habitat, which will be injured by such activities. Therefore, ONDA has standing.

## IV. SECOND MILLER DECLARATION

Finally, BLM asks the Court to strike Dr. Miller's second declaration "[f]or the same reasons" the agency gives for its motion to strike his first declaration. BLM Strike Reply Br. at 2 n.1. The Court should deny BLM's request to strike the Second Miller Declaration because BLM failed to comply with the certification requirement of LR 7-1(a), as required by LR 56-1(b)

("Evidentiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a)").

In the alternative, the Court should deny BLM's request because, like the first Miller Declaration, the second fits within established exceptions to the record review rule. *See* ONDA Resp. in Opp. To Motion to Strike (Dkt # 48) at 2–3 (listing the four recognized exceptions to the general rule that judicial review of agency action is limited to the administrative record). For the same reasons ONDA explained in its strike response brief, Dr. Miller's second declaration is properly before the Court. Dr. Miller once again highlights the ways in which BLM's route maintenance decisions ignored, downplayed, and wrongly interpreted significant information relevant to the project's likely impacts to sage-grouse, and explains complex subject matter concerning spatial analysis of impacts to the bird and its recognized habitat areas. *See id*. at 3–8; Second Miller Decl. ¶¶ 26–48. In many instances, Dr. Miller responds to specific, new contentions made by BLM through the agency's own Keller and Daniels declarations. *See especially* Second Miller Decl. ¶¶ 36–48 (discussing spatial analysis of sage-grouse issues). Dr. Miller also answers BLM's new questions concerning his qualifications, Second Miller Decl. ¶¶ 9–16, and responds to the agency's specious "mystery data" argument, *id*. ¶¶ 17–25. In short, this Court should consider Dr. Miller's second declaration because it helps fill important gaps for basic information that is lacking in BLM's truncated environmental review.

## CONCLUSION

ONDA again respectfully requests the Court to set aside and vacate BLM's CX decisions as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and order other such relief as may be necessary or prayed for hereafter including mitigating measures to address unlawful route maintenance already completed by BLM.

DATED this 27th day of November, 2013.    Respectfully submitted,

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff