IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OREGON NATURAL DESERT
ASSOCIATION,

                       Plaintiff,                           2:12-cv-01551-PK

v.                                          OPINION AND ORDER

BRENDAN CAIN, RICHARD ROY,
RHONDA KARGES, and BUREAU OF
LAND MANAGEMENT,

                       Defendants.

PAPAK, Magistrate Judge:

        Plaintiff Oregon Natural Desert Association ("ONDA") brings this action arising from the

Bureau of Land Management's ("BLM") issuance of six decisions authorizing road maintenance

on various routes throughout the Burns District in Oregon. ONDA complains that BLM violated

the National Environmental Policy Act ("NEPA") by failing to prepare an environmental impact

Page 1 - OPINION AND ORDER

statement ("EIS") for the projects. ONDA further complains that BLM violated the Federal Land

Policy and Management Act ("FLPMA") by authorizing actions not in accordance with the

applicable land-use plans. Now before the court are ONDA's motion for summary judgment

(#32), BLM's motion to strike extra-record evidence (#40), BLM's cross motion for summary

judgment (#44), and ONDA's motion for leave to file a surreply (#58). For the reasons discussed

below, ONDA's motion for summary judgment is denied, BLM's motion to strike extra-record

evidence is denied as moot, BLM's cross motion for summary judgment is granted, and ONDA's

motion for leave to file a surreply is granted.

## BACKGROUND

I.    **Statutory and Regulatory Framework**

A.    **FLPMA**

"The FLPMA directs that the Secretary of the Interior, who oversees the BLM, 'shall, with

public involvement . . . , develop, maintain, and, when appropriate, revise land use plans which

provide by tracts or areas for the use of the public lands.'" *Or. Natural Desert Ass'n v. BLM*, 625

F.3d 1092, 1096 (9th Cir. 2010) (quoting 43 U.S.C. § 1712(a)). A land-use plan, or resource-

management plan, "describes, for a particular area, allowable uses, goals for future condition of

the land, and specific next steps." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59 (2004)

(citing 43 C.F.R. § 1601.0-5(k)). The Ninth Circuit has explained:

> Among other requirements, these plans are to "use and observe the
> principles of multiple use and sustained yield"; "use a systematic
> interdisciplinary approach"; "give priority to the designation and
> protection of areas of critical environmental concern"; and "weigh
> long-term benefits to the public against short-term benefits." 43
> U.S.C. § 1712(c). The BLM "shall manage the public lands" in
> accordance with these plans. *Id.* § 1732(a).

*Or. Natural Desert Ass'n*, 625 F.3d at 1096 (footnote omitted).

    **B.**    **NEPA**

    The NEPA "is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (citation omitted); *accord Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 794-95 (9th Cir. 2012) (discussing NEPA). Pursuant to NEPA, "a federal agency must prepare an EIS, specifically, a 'detailed statement' on 'the environmental impact' of 'major Federal actions significantly affecting the quality of the human environment.'" *Alcoa*, 698 F.3d at 795 (quoting 42 U.S.C. § 4332(C)(i), *and* 40 C.F.R. § 1502.1).

    An agency may dispense with the EIS requirement, however, if the proposed action falls within a "categorical exclusion" and there are no "extraordinary circumstances." 40 C.F.R. § 1508.4. A categorical exclusion ("CX") is "a category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.*; *see also Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999). In accordance with NEPA, the Office of the Secretary of the Interior has promulgated a list of actions that are categorically excluded, including "[r]outine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects)." 43 C.F.R. § 46.210(f). "[A]n agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr. for Env't*, 189 F.3d at 857.

Even if a proposed action falls within a categorical exclusion, NEPA requires an EIS if an extraordinary circumstance applies. 40 C.F.R. § 1508.4. In accordance with NEPA, the Office of the Secretary of the Interior has promulgated a list of extraordinary circumstances. *See* 43 C.F.R. § 46.215. For instance, if the proposed action will "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks," *Id.* § 46.215(d), the agency must satisfy NEPA's procedural requirements with regard to an EIS. "Applicability of extraordinary circumstances to categorical exclusions is determined by the Responsible Official." *Id.* § 46.215.

## II.    Burns District

The BLM Burns District Office "manages 3,275,694 acres of public land located primarily in Harney County, Southeastern Oregon." AR 6186. The Burns District is comprised of two Resource Areas—the Andrews Resource Area and the Three Rivers Resource Area. *Id.* The Andrews Resource Area is "further divided into land contained within the boundary of the Steens Mountain Cooperative Management and Protection Area (CMPA) and those in the Andrews [Resource Area] outside the CMPA boundary; the latter is titled the Andrews Management Unit." *Id.*

## III.   Challenged Decisions

On November 30, 2009, BLM issued CX Number BO60-2010-0010, which authorizes road maintenance throughout the Andrews Resource Area ("2009 Andrews CX"). *See* AR 4690. In relevant part, the 2009 Andrews CX provides:

> Roads would be maintained consistent with assigned maintenance
> levels and within existing disturbance (like-for-like). Roads may
> be graded, graveled, rocks removed, ditches cleaned, and culverts

> or rock crossings installed to prevent accelerated erosions and to
> provide easier access for firefighting personnel, administration and
> the public. . . . This CX does not cover construction or road
> upgrading activities. . . .
>
> All equipment will be cleaned prior to beginning work on new road
> locations to minimize opportunities for spread of weeds by seeds or
> other plant parts.

*Id.* In invoking the CX, BLM found that no extraordinary circumstances applied and that the

proposed road maintenance conformed to the land-use plan in place for the Andrews Resource

Area. *See id.* at 4690-93.

Nearly a year and a half later, on May 10, 2011, BLM issued CX Number BO70-2011-

0031, which authorizes road maintenance throughout the Chimney Allotment in the Andrews

Resource Area ("Chimney CX"). *See* AR 1977. The Chimney CX provides for grading, ditch

cleaning, and brushing on 27.7 miles of open BLM roads, 8.8 of which are in the CMPA. *See id.*

The CX further provides that "[m]aintenance would occur within the original footprint of the

road" and that the CX "does not cover road construction or road upgrading activities." *Id.* Like

the 2009 Andrews CX, the Chimney CX requires that "[a]ll equipment be cleaned prior to

beginning work on roads to minimize opportunities for spread of weeds." *Id.* In invoking the

CX, BLM found that no extraordinary circumstances applied and that the proposed road

maintenance conformed to the land-use plan in place for the Andrews Resource Area. *See id.* at

1977-80.

On May 17, 2011, BLM issued CX Number BO50-2011-0021, which authorizes

maintenance of "1.2 miles of road in the Main Pasture of East Cow Creek Allotment" in the

Three Rivers Resource Area ("East Cow Creek CX"). AR 1982. The East Cow Creek CX

provides that "[t]he road would be graded, ditches cleaned, and a rock crossing constructed as needed." *Id.* As with the prior CXs, the East Cow Creek CX "does not cover construction or road upgrading activities" and requires the cleaning of equipment to "minimize opportunities for spread of weeds." *Id.* In invoking the CX, BLM found that no extraordinary circumstances applied and that the proposed road maintenance conformed to the land-use plan in place for the Three Rivers Resource Area. *See id.* at 1982-85.

On June 1, 2011, BLM issued CX Number BO50-2011-0034, which authorizes maintenance of roads "within [the] Burnt Flat, Riddle Mountain, Happy Valley and Smyth-Kiger Allotments" in the Three Rivers Resource Area ("Three Rivers Southeast CX"). AR 1830. The Three Rivers Southeast CX provides that "[r]oads may be graded, slides removed, drainage structures maintained, culverts or rock crossings installed to prevent accelerated erosion, and roadside brushing." *Id.* As with the prior CXs, the Three Rivers Southeast CX "does not permit new construction/realignment or road upgrading activities to a different intensity/maintenance level" and requires that all equipment be cleaned "to minimize opportunity for spread of weeds." *Id.* In invoking the CX, BLM found that no extraordinary circumstances applied and that the proposed road maintenance conformed to the land-use plan in place for the Three Rivers Resource Area. *See id.* at 1830-33.

On June 14, 2011, BLM issued CX Number BO60-2011-0042, which authorizes maintenance of roads "within [the] Pueblo-Lone Mountain, Trout Creek Mountain and Tule Springs Allotments" in the Andrews Resource Area ("2011 Andrews CX"). AR 175. The 2011 Andrews CX provides that "[r]oads may be graded, slides removed, drainage structures maintained, culverts or rock crossings installed to prevent accelerated erosion, and roadside

bushing." *Id.* As with the prior CXs, the 2011 Andrews CX "does not permit new construction/realignment or road upgrading activities to a different maintenance level" and requires all equipment to be cleaned "to minimize opportunity for spread of weeds." *Id.* In invoking the CX, BLM found that no extraordinary circumstances applied and that the proposed road maintenance conformed to the land-use plan in place for the Andrews Resource Area. *Id.* at 175-78.

Finally, on January 23, 2012, BLM issued CX Number BO60-2012-0012, which authorizes maintenance on "those road sections known as Fields Basin Rincon Road, Rincon Flat Road and Rincon Spring Road" in the Andrews Resource Area ("Rincon Flat CX"). AR 1. The Rincon Flat CX provides for "continuous surface blading, spot blading, ditch cleaning, and fixing and/or replacing culverts when such work is deemed necessary, using whatever equipment may be needed such as a road grader, backhoe or caterpillar in order to maintain the road." *Id.* Although BLM notes that "[t]he roads exist on the landscape," it does not specifically prohibit new construction or upgrading. *Id.* at 2. Unlike the prior CXs, the Rincon Flat CX specifically notes the possibility of disturbance to sage-grouse:

> Due to the number of sage-grouse leks close to the road in the Fields Basin Allotment, no maintenance activities would be conducted during March 15 to May 15 unless conducted after 10:00 am to avoid disturbance to strutting sage-grouse. This would not apply to the section of road that is planned to have material removed from it. All other sections would be restricted to these dates and times.

*Id.* at 1. The Rincon Flat CX further provides that all equipment would be cleaned prior to arrival at the project site to minimize the spread of weeds. *See id.* In invoking the CX, BLM found that no extraordinary circumstances applied and that the proposed road maintenance

Page 7 - OPINION AND ORDER

conformed to the land-use plan in place for the Andrews Resource Area. *See id.* at 1-4.

## IV.    Procedural History

On August 28, 2012, ONDA initiated the instant action against BLM, Brenda Cain, Richard Roy, and Rhonda Karges, challenging the six CXs under the NEPA, the FLPMA, and the Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"). On June 21, 2013, ONDA filed its motion for summary judgment (#32) and the first declaration of Dr. Craig Miller, M.D. (#34). Thereafter, on August 9, 2013, BLM filed the motion to strike extra-record evidence (#40), requesting that the court strike Dr. Miller's declaration as extra-record evidence not permitted under the Administrative Procedure Act ("APA"). That same date, BLM filed its cross motion for summary judgment and response to ONDA's motion for summary judgment (#44). On September 20, 2013, ONDA filed its reply in support of its motion for summary judgment and resistance to BLM's cross motion for summary judgment (#47). In its brief, ONDA withdraws its claim under the Steens Act. Also on September 20, 2013, ONDA filed its resistance to BLM's motion to strike extra-record evidence (#48), along with Dr. Miller's second declaration (#49). On November 12, 2013, BLM filed a reply in support of its cross motion for summary judgment (#54) and also filed a reply in support of its motion to strike extra-record evidence (#55), maintaining that the court should strike Dr. Miller's first declaration and requesting that the court also strike Dr. Miller's second declaration. On November 27, 2013, ONDA filed a motion for leave to file a surreply (#58). In its motion for leave to file a surreply, ONDA argues that BLM presents new facts and new arguments in its reply brief and requests that the court permit ONDA to respond. On December 16, 2013, BLM filed a resistance to ONDA's motion for leave to file a surreply (#60). On December 18, 2013, the court heard oral

argument on the pending motions. Following oral argument, ONDA filed a reply in support of

its motion for leave to file a surreply (#62). I find that ONDA's motion for summary judgment,

BLM's motion to strike extra-record evidence, BLM's cross motion for summary judgment, and

ONDA's motion to file a surreply are fully submitted and ready for decision.

LEGAL STANDARDS

## I.    Summary Judgment

Summary judgment is appropriate if the depositions, answers to interrogatories, and

admissions on file, together with any affidavits or declarations, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*See* Fed. R. Civ. P. 56. Where the district court reviews an administrative action pursuant to the

APA, summary judgment is an appropriate mechanism for deciding the purely legal question of

whether the agency could have reasonably reached the decision that it did. *Occidental Eng'g Co.*

*v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). On cross motions for summary judgment pursuant

to APA review, reviewing courts do not separately analyze each motion as they would with

ordinary cross motions for summary judgment, presumably because the reviewing courts address

questions of law equally applicable to both motions. *Cf. Umpqua Watersheds v. U.S. Forest*

*Serv.*, 725 F. Supp. 2d 1232 (D. Or. 2010); *Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp.

2d 1202 (D. Or. 2006).

## II.    Standard of Review for Agency Decisions Generally

Where an agency has taken final action, a court may set aside that action under

§ 706(2)(A) of the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360,

377 (1989).  Review under the arbitrary and capricious standard is narrow, and courts give

deference to an agency's construction of a statutory provision it is charged with administering.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43

(1983); *Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th

Cir. 2000).  The reviewing court must determine whether the agency's decision was based on a

consideration of the relevant factors or whether there has been a clear error of judgment.  *Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170,

1177 (9th Cir. 2000).  For example, the court may set aside a decision if the agency has relied on

> factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before
> the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *accord Nw. Coal. for Alternatives to Pesticides*

*(NCAP) v. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008).

　　　Thus, the reviewing court's inquiry, though narrow, must be "'searching and careful.'"

*Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (quoting

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  Further,

"[d]eference to an agency's technical expertise and experience is particularly warranted with

respect to questions involving . . . scientific matters." *United States v. Alpine Land & Reservoir*

*Co.*, 887 F.2d 207, 213 (9th Cir. 1989).  However, the "presumption of agency expertise may be

rebutted if its decisions, even though based on scientific expertise, are not reasoned."

*Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

Therefore, although the scope of review is narrow, the depth of review is substantial.  *Nw. Coal.*

*for Alternatives to Pesticides*, 544 F.3d at 1052 n.7 ("'[A]lthough data interpretation and analysis are functions that often lie within an agency's realm of expertise, it is our duty to review those functions to ascertain whether the agency's actions were complete, reasoned, and adequately explained. The mere fact that an agency is operating in a field of its expertise does not excuse us from our customary review responsibilities." (quoting *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1373 (D.C. Cir. 1985) (Wright, J., dissenting))).

III.    **Scope of Review**

The APA requires a court to "review the whole record or those parts of it cited by a party" when reviewing an agency action. 5 U.S.C. § 706. The "whole record" consists of "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). The whole record is not just what the agency submitted as the administrative record but also includes "all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted) (internal quotation mark omitted).

## DISCUSSION

Before considering ONDA's NEPA and FLMPA claims, I first address ONDA's motion for leave to file a surreply, BLM's argument that ONDA lacks standing to challenge the six CX decisions, and BLM's motion to strike extra-record evidence.

I.    **Motion for Leave to File a Surreply**

In the memorandum in support of the motion for leave to file a surreply, ONDA contends that BLM presents new facts and raises new arguments in its reply brief and argues that ONDA

should have an opportunity to respond to these new contentions. Specifically, ONDA argues that BLM makes new factual arguments about greater sage-grouse leks, raises reliability concerns regarding Dr. Miller's GIS analysis, raises new arguments with regard to ONDA's standing, and seeks to strike Dr. Miller's second declaration.

"When a party has raised new arguments or presented new evidence in a reply to an opposition, the court may permit the other party to counter the new arguments or evidence." *Jordan v. Terhune*, No. CIV S-03-1820 LKK KJM P, 2009 WL 276764, at *3 (E.D. Cal. Feb. 5, 2009) (citing *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003)); *see also Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("'[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non]movant an opportunity to respond.'" (citation omitted)).

Here, while I do not agree that all of the evidence and arguments ONDA identifies as "new" are, in fact, new, I will nevertheless grant ONDA's motion for leave to file a surreply. After review of the proposed surreply, I find that it does not alter my conclusions.

## II.    Standing

BLM requests that the court grant summary judgment in its favor on ONDA's claims relating to the East Cow Creek CX, the Three Rivers Southeast CX, the Rincon Flat CX, and the Chimney CX on the basis that ONDA lacks standing to challenge these decisions. BLM argues that, because "ONDA is challenging six discrete agency actions," it must establish an injury-in-fact as to each agency decision. BLM's Reply in Support of Cross Motion for Summary Judgment, #54, at 8. Although BLM acknowledges that Dr. Miller's declaration sufficiently asserts a geographic nexus to the areas impacted by the 2009 Andrews CX and the 2011 Andrews

Page 12 - OPINION AND ORDER

CX, BLM argues that ONDA has failed to present admissible evidence that Dr. Miller, or any other ONDA member, has used and enjoyed or has specific and definite future plans to use and enjoy the roads at issue in the four other CXs.

In response, ONDA argues that it "has demonstrated a sufficiently concrete interest to establish an injury in fact" because "the complaint alleges that ONDA's members and staff use and enjoy the public lands that are the subject of the challenged agency decisions" and Dr. Miller's declaration establishes that he has visited, and will visit in the future, the areas impacted by the CXs. ONDA's Surreply in Support of Motion for Summary Judgment, #59-1, at 11. ONDA further contends that BLM's suggestion that ONDA must establish that Dr. Miller, or another ONDA member, has used each road at issue in the six CXs is erroneous. Rather, ONDA argues that, because Dr. Miller has sufficiently alleged that the CXs will have wide-ranging effects that will interfere with his opportunity to "observe sage grouse and sage-grouse habitat," ONDA has standing to challenge all six agency decisions. *Id.* at 12.

To establish standing under Article III,[1]

> a plaintiff must show (1) it has suffered an'"injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Nuclear Info. & Res. Serv.*, 457 F.3d at 949 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). An association has standing to sue on behalf

---

[1] In addition to Article III standing, a plaintiff must meet the nonconstitutional or prudential standing requirements. *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006). BLM does not argue that ONDA lacks prudential standing and, thus, I find it unnecessary to address this issue.

of its members if "its members would . . . have standing to sue in their own right, the interests at

stake are germane to the organization's purpose, and neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Friends of the Earth,*

*Inc.*, 528 U.S. at 181; *accord W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 482-83 (9th

Cir. 2011). "The party invoking federal jurisdiction bears the burden of establishing" that the

standing requirements are satisfied. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

At the summary-judgment stage, "the plaintiff [cannot] rest on . . . 'mere allegations,' but must

'set forth' by affidavit or other evidence 'specific facts'" to establish standing. *Id.* (citation

omitted).

Environmental plaintiffs may satisfy the injury-in-fact requirement by showing that "they

will suffer harm by virtue of their geographic proximity to and use of areas that will be affected"

by the challenged decision. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961,

971 (9th Cir. 2003). That is, environmental plaintiffs may establish that they will be injured by

averring "that they use the affected area and are persons for whom the aesthetic and recreational

values of the area will be lessened by the challenged activity." *Id.* (quoting *Friends of the Earth,*

*Inc.*, 528 U.S. at 183) (internal quotation marks omitted); *see also Ecological Rights Found. v.*

*Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("Repeated recreational use itself,

accompanied by a credible allegation of desired future use, can be sufficient, even if relatively

infrequent, to demonstrate that environmental degradation of the area is injurious to that

person.").

In this case, BLM argues that ONDA cannot establish standing because it fails to show

that its individual members would have standing to sue in their own right. Specifically, BLM

maintains that ONDA has failed to satisfy the injury-in-fact requirement.  After reviewing Dr.

Miller's first and second declarations and the attached maps,[2] I find that ONDA has standing to

challenge all of the CXs other than the East Cow Creek CX.  Dr. Miller declares that he has

visited the roads impacted by the 2009 Andrews CX and the 2011 Andrews CX, and BLM does

not contest that ONDA has standing to challenge those CXs.  *See* Map 17, Second Declaration of

Dr. Craig Miller ("Second Miller Declaration"), #49-1, at 1 (showing the areas Dr. Miller has

visited).  Dr. Miller also indicates that he intends to visit "by the end of next year" various parts

of the Burns District for the purpose of "documentation of route condition, study of surrounding

habitat condition, hiking, and wildlife viewing."  Second Miller Declaration, #49, ¶ 8; *see* Map

18, Second Miller Declaration, #49-2, at 1 (showing the areas Dr. Miller intends to visit); *see*

*also Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013) (finding that a Wilderness Society

member's intention to return to certain roadless areas "every spring and every fall for as long as

[he is] physically able" was sufficient to satisfy the geographic-nexus requirement (internal

quotation mark omitted)).  Specifically, Dr. Miller declares that he intends to visit routes within

the Three Rivers Southeast CX and the Chimney CX, as well as routes near the Rincon Flat CX.

*See* Map 18, Second Miller Declaration, #49-2, at 1; *see also* Map 16, First Declaration of Dr.

Craig Miller ("First Miller Declaration"), #34-16, at 1.  Given Dr. Miller's contention that the

proposed road maintenance will have wide-ranging effects on the sage-grouse population through

the introduction of noxious weeds and habitat fragmentation, I conclude that ONDA has

---

[2] While BLM requests that the court strike Dr. Miller's declarations and accompanying maps as extra-record evidence, BLM does not challenge the use of the declarations or maps for the purpose of determining whether ONDA has standing.  *See* BLM's Memo. in Support of Motion to Strike Extra-Record Evidence, #41, at 2 n.1.

sufficiently established the injury-in-fact requirement as to the Three Rivers Southeast CX, the

Rincon Flat CX, and the Chimney CX. *See Nuclear Info. & Res. Serv.*, 457 F.3d at 952 ("We

have defined the geographic nexus requirement broadly to permit challenges to actions with

wide-ranging geographic effects where the petitioners properly allege, and support with

affidavits, that they use the impacted area, even if the impacted area is vast.").

I am not persuaded, however, that ONDA has standing to challenge the East Cow Creek

CX, which authorizes maintenance on a 1.2 mile road connecting two private properties. The

road is located in the northern portion of the Burns District and is distant from all of the other

roads at issue in the five other CXs. *See* Map 16, First Miller Declaration, #34-16, at 1 (showing

the location of the East Cow Creek CX within the Burns District). Neither Dr. Miller nor any

other ONDA member has visited the road nor do they have any intentions of visiting it in the

future. *See* Map 17, Second Miller Declaration, #49-1, at 1 (showing the areas Dr. Miller and

other members have visited); Map 18, Second Miller Declaration, #49-2, at 1 (showing the areas

Dr. Miller intends to visit). ONDA has not plausibly alleged that destruction or fragmentation of

sage-grouse habitat along or near this road will impact its members' ability to observe sage-

grouse in the southern portion of the district where its members have visited and will continue to

visit. Indeed, Map 10, attached to Dr. Miller's first declaration, suggests that the sage-grouse

population in the vicinity of the road at issue in the East Cow Creek CX is a distinct population

that is unconnected to the sage-grouse population in the southern portion of the Burns District.

*See* Map 10, First Miller Declaration, #34-10, at 1; *see also* Second Miller Declaration, #49, ¶ 46

n. 8 (discussing Map 10 and noting that, "where lines do not connect, a corridor probably does

not exist"). Thus, I find that ONDA has failed to show an injury-in-fact as to the East Cow Creek

CX and, consequently, ONDA lacks standing to challenge this CX. I therefore grant BLM's cross motion for summary judgment to the extent it requests judgment in BLM's favor on ONDA's claims related to the East Cow Creek CX.[3]

## III.   Motion to Strike

In the motion to strike extra-record evidence, BLM moves to strike Dr. Miller's first and second declarations and accompanying maps on the basis that they are improper extra-record evidence not permitted under the APA. Generally, judicial review of agency action is limited to review of the administrative record. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). The Ninth Circuit, however, has recognized four exceptions to this rule, allowing extra-record materials: (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter; or (4) when a plaintiff makes a showing of agency bad faith. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006). Parties may not use post-decision information either to justify or attack an agency's decision. *Id.*

In this case, in conducting my analysis of ONDA's claims below, I considered Dr. Miller's declarations but did not find them to alter my conclusions. Accordingly, I deny as moot BLM's motion to strike extra-record evidence.

## IV.   NEPA Claim

Under its NEPA claim, ONDA argues that BLM acted arbitrarily, capriciously, or abused

---

[3] Although ONDA lacks standing as to the East Cow Creek CX, I will proceed with my analysis of ONDA's claims as if ONDA has standing to challenge all six CXs.

its discretion when it failed to prepare an EIS for the six challenged actions. First, ONDA argues that the proposed road maintenance falls outside the scope of the routine-maintenance CX. That is, ONDA contends that the mechanical maintenance of "576 miles of routes splayed across more than 3 million acres of public land" is not the limited or insignificant action permitted under 43 C.F.R. § 46.210(f) and, thus, BLM was required under NEPA to prepare an EIS. ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 16. Second, even if the road maintenance at issue is within the scope of the routine-maintenance CX, ONDA contends that BLM was still required to prepare an EIS because five exceptional circumstances apply. Third, ONDA argues that BLM improperly segmented "connected actions" and that the actions combined have a significant impact on the environment, thus requiring an EIS. *Id.* at 29 (internal quotation marks omitted).

A.    **Scope of Categorical Exclusion**

ONDA first argues that "[t]he maintenance BLM authorizes is far more intense than the types of limited, administrative actions contemplated by the exclusion category at 43 C.F.R. § 46.210(f)." *Id.* at 16. ONDA contends that all six agency actions together affect 576 miles of public-land routes and that the proposals involve far more intensive work than the "spot maintenance" covered by the routine-maintenance CX. *Id.* Indeed, ONDA argues that some of the "roads" identified for maintenance are nonexistent. *Id.* at 17-18. Moreover, ONDA contends that the proposed maintenance will have "long-term effects lasting decades or longer" as such maintenance will damage the native vegetation and allow for the spread of invasive weeds. *Id.* at 17.

In response, BLM contends that the proposed road maintenance is limited in nature and

effect and, therefore, falls within the routine-maintenance CX. Specifically, BLM maintains that each CX must be viewed separately, each CX authorizes limited maintenance on particular roads, and several of the CXs specifically state that no new construction or upgrading is authorized. BLM claims that ONDA "misstates the intensity of the routine maintenance at issue in each distinct CX" and that some locations will require only minimal maintenance. BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 29. Finally, BLM notes that, with regard to those roads in the Andrews Management Unit, the proposed maintenance is consistent with the resource-management plan, which provides:

> Normally, routine operation and maintenance actions are categorically excluded from NEPA analysis (with the exception of actions conducted within WSAs). Such activities could include, but are not limited to, routine maintenance of existing roads, ditches, culverts, water control structures, recreation facilities, reservoirs, wells, pipelines, waterholes, fences, cattleguards, seedings, fish and wildlife structures, and signs. These types of actions are part of implementation of the [resource-management plan] and should not require further analysis to implement.

AR 6208. BLM argues that any challenge to road maintenance on roads within the Andrews Management Unit "is a transparent attempt to relitigate ONDA's unsuccessful challenge to the [Andrews Management Unit] road designations." BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 30.

I find that BLM's interpretation of its routine-maintenance CX is not plainly erroneous and its conclusion that the proposed actions fall within the CX is not arbitrary or capricious. I find that the proposed maintenance falls within the plain meaning of the routine-maintenance CX, which authorizes "[r]outine and continuing government business, including such things as supervision, administration, operations, *maintenance, renovations, and replacement activities*

having limited context and intensity (e.g., limited size and magnitude or short-term effects)." 43

C.F.R. § 46.210(f) (emphasis added). In this case, for each of the challenged CX decisions, BLM

has identified specific roads to be maintained and has limited the extent of the proposed

maintenance for each road. *See, e.g.*, AR 1977 ("Maintenance would occur within the original

footprint of the road."). ONDA's suggestion that the proposed maintenance would involve "the

permanent creation or substantial upgrading of miles upon miles of roads," ONDA's Memo. in

Support of Motion for Summary Judgment, #33, at 17—that is, work beyond routine

maintenance—is without merit. Five of the six CXs at issue specifically state that they do not

authorize road construction or upgrading. *See* AR 4690 (2009 Andrews CX); AR 1977

(Chimney CX); AR 1982 (East Cow Creek CX); AR 1830 (Three Rivers Southeast CX); AR 175

(2011 Andrews CX). While the remaining CX, which authorizes work on Rincon Flat Road,

does specifically prohibit construction or upgrading, it provides that the roads at issue "exist on

the landscape," AR 2, and BLM clarified at oral argument that the CX does not authorize the

construction or upgrading of any roads. Although ONDA suggests that 43 C.F.R. § 46.210(f) is

limited to "spot maintenance," there is nothing in the regulation itself that would suggest that

categorically excluded maintenance must be so limited.

      I am also unpersuaded by ONDA's suggestion that the sheer number of miles at issue

takes these actions outside of the scope of the routine-maintenance CX. First, ONDA's argument

is premised on a finding that the court must view all of the CXs together rather than as individual

actions; however, as set forth below, I find that, with regard to each CX decision, BLM

adequately assessed whether its proposed action had a direct relationship with any other action

and did not act arbitrarily or capriciously in determining that there was no such relationship.

Second, ONDA cites no authority in support of its assertion that the sheer number of miles to be maintained can take an otherwise categorically excluded maintenance project outside of the scope of the routine-maintenance CX. Indeed, the BLM has previously invoked the routine-maintenance CX under circumstances in which nearly 2,000 miles were to be maintained. *See* AR 170 (permitting maintenance, including "grading, paving, patching, [and] surfacing," of 2,000 miles of roads in the Coos Bay District).

ONDA's argument that the proposed actions are not limited in scope due to the lack of any "expiration date" or timetable is likewise unpersuasive. If BLM were to interpret the challenged CXs to mean that it can now maintain the roads at issue forever without going back through the CX process, that would be problematic. *See West v. Sec'y. of Dep't of Transp.*, 206 F.3d 920, 930 (9th Cir. 2000) ("We have found no support for an agency categorically to exclude a project with undefined parameters and an uncertain timetable for start or completion."). At oral argument, however, BLM clarified that it interpreted the CXs to be time-sensitive; that is, if BLM were not to conduct the maintenance within a reasonable amount of time, the CXs could be challenged on the basis of staleness.

Finally, I agree with BLM that, with regard to those CXs involving maintenance of roads in the Andrews Management Unit, ONDA is attempting to relitigate the Andrews Management Unit resource-management plan. The Andrews Management Unit resource-management plan "designates roads and routes as open or closed and what levels of maintenance they will receive." *Or. Natural Desert Ass'n v. Shuford*, Civ. No. 06-242-AA, 2007 WL 1695162, at *8 (D. Or. June 8, 2007), *aff'd sub nom. Or. Natural Desert Ass'n v. McDaniel*, 405 F. App'x 197 (9th Cir. 2010). The resource-management plan itself states that maintenance that is "part of implementation of

Page 21 - OPINION AND ORDER

the" resource-management plan is categorically excluded. AR 6208.

Thus, in light of the foregoing, I find that BLM did not act arbitrarily or capriciously when it determined that the six actions at issue fall within the routine-maintenance CX.

### B.    Extraordinary Circumstances

Next, ONDA argues that, even if the maintenance at issue falls within the scope of the routine-maintenance CX, BLM's decision to invoke the CX was still arbitrary or capricious because five extraordinary circumstances listed under 43 C.F.R. § 46.215 apply.

### 1.    Noxious Weeds

ONDA first argues that BLM did not adequately explain why the proposed actions would not "[c]ontribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or . . . promote the introduction, growth, or expansion of the range of such species." 43 C.F.R. § 46.215(l). Specifically, ONDA argues that the link between roads and the spread of weeds is well-documented and that BLM failed to adequately explain in the CX decisions why the introduction and spread of weeds was not an extraordinary circumstance requiring preparation of an EIS. In response, BLM argues that its "weed expert," Lesley Richman, determined that "roads are BLM's 'highest priority' for weed monitoring and treatment." BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 32-33. Thus, "roads actually aid BLM in identifying and treating noxious weed infestations." *Id.* at 33.

I find that, with regard to each CX decision, BLM adequately assessed the potential for the spread of weeds and did not act arbitrarily or capriciously in determining that the extraordinary circumstance did not apply. For each CX, BLM's expert, Ms. Richman, discussed

Page 22 - OPINION AND ORDER

the possibility of the spread of weeds, noted ways to minimize the spread of weeds, and ultimately concluded that the extraordinary circumstance did not apply. *See* AR 4693; AR 1980; AR 1984; AR 1833; AR 178; AR 3. For example, as a means of minimizing the spread of weeds, each CX requires all equipment to cleaned prior to beginning work on the road maintenance. *See* AR 4690; AR 1977; AR 1982; AR 1830; AR 175; AR 1.

To support its argument that BLM did not adequately explain why this extraordinary circumstance does not apply, ONDA relies on evidence in the record discussing the impact of roads on the introduction and spread of noxious weeds. *See, e.g.*, AR 3580-83. Much of this evidence, however, does not relate to the type of project at issue here—that is, routine road maintenance. For instance, Dr. Jonathan L. Gelbard, whom ONDA heavily relies on, discusses the potential for the introduction and spread of weeds when roads are constructed and improved and notes that the "growth and reproduction" of noxious weeds is "caused by not only roads, themselves, but also by [off-road vehicles] and livestock." AR 3580. Dr. Gelbard also suggests that the type of habitat at issue plays a role in the extent of weed invasion. *Id.* at 3582. Thus, although there is certainly evidence to suggest that there is a link between roads and noxious weeds, ONDA has failed to demonstrate that this issue is so "black and white" that it was unreasonable for BLM to conclude that its maintenance activities would not contribute to the spread of noxious weeds.

While ONDA certainly disagrees with Ms. Richman's assessment, ONDA's disagreement is not a sufficient basis to find that BLM acted arbitrarily or capriciously. *See Alaska Ctr. for Env't*, 189 F.3d at 859 ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial

agency expertise and is entitled to deference."). Accordingly, I find that BLM did not act arbitrarily or capriciously when it determined that 43 C.F.R. § 46.215(l) did not apply to the six CXs at issue.

### 2.    Ecologically Significant or Critical Areas

Second, ONDA argues that BLM did not adequately explain why the proposed actions would not "[h]ave significant impacts on such natural resources and unique geographic characteristics as . . . wilderness areas[,] . . . migratory birds[,] and other ecologically significant or critical areas." 43 C.F.R. § 46.215(b). Specifically, ONDA contends that the road maintenance authorized by the six CXs at issue will have significant impacts on the greater sage-grouse, a species "'warranted but precluded' from protection under the" Endangered Species Act. AR 2012. "Sage-grouse are sagebrush obligate species and without sagebrush the species cannot persist." *Id.* at 2015. Citing to Dr. Miller's declaration, ONDA contends that BLM's authorized road maintenance will lead to, among other things, habitat fragmentation and destruction and will present barriers to migration corridors. "Dr. Miller's spatial analysis illustrates that 85% of the 576 miles of public land routes authorized for maintenance under the CXs lie within essential sage-grouse habitats." ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 22.

In response, BLM argues that secondary roads, such as the roads at issue in the six CX decisions, do not have a significant impact on the sage-grouse population. Moreover, BLM argues that "maintenance of existing roads may actually benefit sage-grouse by enabling access for appropriate management and grazing administration." BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 34. BLM specifically suggests that wildfires pose a serious threat to sage-grouse habitat and that road maintenance will aid in wildfire-suppression

Page 24 - OPINION AND ORDER

efforts.

I find that, with regard to each CX decision, BLM adequately assessed the potential

impact on the sage-grouse population and did not act arbitrarily or capriciously in determining

that the extraordinary circumstance did not apply.  Although BLM did not specifically discuss

sage-grouse in the 2009 Andrews CX, the Chimney CX, the East Cow Creek CX, the Three

Rivers Southeast CX, and the 2011 Andrews CX, each CX determined that the proposed

maintenance would not impact migratory-bird populations:

> Maintenance work would be limited to previously disturbed areas
> (existing road), and occur over a relatively short period (less than a
> week).  Birds in the immediate vicinity of the road may flush as
> equipment passes, but effects would be temporary and birds would
> likely return as soon as maintenance ceases.  Some vegetation
> growing into the road from the edge may be bladed, but the total
> area potentially directly impacted would be less than half an acre.
> Birds may forage in the road or along the edges of the road, but are
> unlikely to nest in this area.

AR 1978; *accord* AR 1983; AR 1831; AR 176; *see also* AR 4691 (concluding that "birds will

not be impacted due to the temporary nature of the disturbance and negligible impact to the

habitat").  The Rincon Flat CX specifically noted the potential impact to sage-grouse and

proposed a way to minimize the impact:

> Due to the number of sage-grouse leks close to the road in the
> Fields Basin Allotment, no maintenance activities would be
> conducted during March 15 to May 15 unless conducted after
> 10:00 am to avoid disturbance to strutting sage-grouse. This would
> not apply to the section of road that is planned to have material
> removed rom it.  All other sections would be restricted to these
> dates and times.

AR 1.

BLM's conclusion that the proposed maintenance would not significantly impact the sage-

Page 25 - OPINION AND ORDER

grouse population is supported by the record. *See* AR 558 (citing a 2007 study for the

proposition that "[f]ragmentation by rarely-traveled dirt roads has not been found to be a negative

influence on lek persistence, nor has presence of secondary roads" (citations omitted)); *see also*

AR 95 (recommending that, in priority sage-grouse habitat areas, motorized travel should be

limited "to designated roads, primitive roads, and trails").[4] While ONDA certainly disagrees

with BLM's assessment, ONDA's disagreement is not a sufficient basis to find that BLM acted

arbitrarily or capriciously. *See Alaska Ctr. for Env't*, 189 F.3d at 859 ("Once the agency

considers the proper factors and makes a factual determination on whether the impacts are

significant or not, that decision implicates substantial agency expertise and is entitled to

deference."). Accordingly, I find that BLM did not act arbitrarily or capriciously when it

determined that 43 C.F.R. § 46.215(b) did not apply to the six CXs at issue. *See Or. Natural*

*Desert Ass'n v. Jewell*, No. 3:12-cv-00596-MO, 2013 WL 5101338, at *6 (D. Or. Sept. 11, 2013)

(finding that BLM adequately considered the impact of a wind-energy project on habitat

fragmentation and connectivity with relation to the sage-grouse and deferring to the BLM's

conclusion that "'fragmentation by rarely traveled dirt roads has not been shown to have a

negative influence upon lek persistence'" (citation omitted)).

---

[4] I note that BLM contends that, in finding that 43 C.F.R. § 46.215(b) did not apply with regard to each CX, it relied on two documents indicating that secondary roads do not impact the sage-grouse population. The first is a document titled "A Report on National Greater Sage-Grouse Conservation Measures" that was published in December 2011, *see* AR 85-158, and the second is a final EIS authored by BLM for the North Steens 230-kv Transmission Line Project that was published in October 2011, *see* AR 246-1505. Both of these documents were published well after five of the six CXs were issued and, thus, BLM was clearly not relying on these documents when it determined that those five CXs would not impact migratory birds. Nevertheless, the October 2011 EIS authored by BLM cites to a 2007 study, which predates all of the CX decisions at issue here, to support its conclusion that secondary roads do not negatively impact the sage-grouse population.

### 3.  Cumulative Impacts

Third, ONDA argues that BLM did not adequately explain why the proposed actions would not "[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental impacts." 43 C.F.R. § 46.215(f).  Specifically, ONDA argues that "BLM artificially splintered 576 miles of route maintenance authorizations into six separate decisions and undertook no analysis whatsoever concerning cumulative effects." ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 24.  ONDA maintains that the "timing of the decisions makes clear BLM should have 'reasonably foreseen' these connected actions." *Id.* at 25.  Even if each individual CX has an insignificant impact, the six CXs together will "slice through important sage-grouse habitats" and lead to habitat fragmentation. *Id.* at 26.

BLM responds that none of the "CXs has a 'direct relationship' with any of the others." BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 36.  BLM notes that the six decisions were issued over a two-and-a-half-year period and that "five of the six CXs are by their own terms targeted at improving access to specific and distinct grazing allotments." *Id.* Moreover, BLM notes that, with regard to the 2009 Andrews CX, BLM staff would not have known that BLM would approve additional road maintenance a year and a half later.

I find that, with regard to each CX decision, BLM adequately assessed whether its proposed action had a direct relationship with any other action and did not act arbitrarily or capriciously in determining that the extraordinary circumstance did not apply.  In each of the CXs, BLM explained that the proposed action does not have a direct relationship to any other action because the roads already exist on the landscape. *See* AR 4692; AR 1979; AR 1984; AR 1832; AR 177; AR 3.  Although BLM offered no additional explanation, I find that none was

required under the circumstances. *Cf. Ctr. for Biological Diversity v. Salazar*, No. 09-08207-
PHX-DGC, 2011 WL 4709874, at *2-3 (D. Ariz. Oct. 7, 2011) (noting that the district court
remanded a case to BLM when BLM only indicated on its categorical-exclusion checklist that the
proposed action had no direct relationship to other actions without providing any rationale), *aff'd
on other grounds*, 706 F.3d 1085 (9th Cir. 2013). Thus, for the reasons more fully set forth in
BLM's memorandum in support of its cross motion for summary judgment and its reply brief, I
find that BLM did not act arbitrarily or capriciously when it determined that 43 C.F.R. §
46.215(f) did not apply to the six CXs at issue.

### 4.    Highly Controversial

Fourth, ONDA argues that BLM did not adequately explain why the proposed actions
would not "[h]ave highly controversial environmental effects or involve unresolved conflicts
concerning alternative uses of available resources." 43 C.F.R. § 46.215(c). Specifically, ONDA
contends that this extraordinary circumstance applies because the proposed road maintenance is
highly controversial in light of its impact on sage-grouse habitat and its potential for introducing
and spreading noxious weeds. Moreover, ONDA again argues that "substantial numbers and
mileages of the CX routes are obscure or do not exist on the ground, or are primitive routes for
which continuous blading would upgrade their current condition, and thus the maintenance
would significantly increase vehicular use of these routes." ONDA Memo. in Support of Motion
for Summary Judgment, #33, at 28. In response, BLM argues that "ONDA's opposition does not
present a bona-fide controversy." BLM's Memo. in Support of Cross Motion for Summary
Judgment, #45, at 38.

"A proposal is highly controversial when there is 'a substantial dispute [about] the size,

Page 28 - OPINION AND ORDER

nature, or effect of the major Federal action rather than the existence of opposition to a use.'"

*Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004) (alteration in original) (quoting *Blue*

*Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).  "'A

substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an

agency's conclusions.'" *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010)

(citation omitted) (emphasis omitted).

　　In this case, while ONDA certainly disagrees with BLM's CX decisions, ONDA's mere

disagreement falls short of establishing that the decisions are highly controversial within the

meaning of 43 C.F.R. § 46.215(c).  As explained above, BLM's determination that the proposed

maintenance would not impact sage-grouse and would not contribute to the introduction or

spread of noxious weeds was reasonable.  Moreover, as explained above, each CX limits

maintenance to already-existing roads.  Indeed, five of the CXs specifically prohibit road

construction or upgrading.  *See* AR 4690 (2009 Andrews CX); AR 1977 (Chimney CX); AR

1982 (East Cow Creek CX); AR 1830 (Three Rivers Southeast CX); AR 175 (2011 Andrews

CX).  Accordingly, I find that BLM did not act arbitrarily or capriciously when it determined that

43 C.F.R. § 46.215(c) did not apply to the six CXs at issue.

　　**5.    Uncertain Effects or Risks**

　　Fifth, ONDA argues that BLM did not adequately explain why the proposed actions

would not "[h]ave highly uncertain and potentially significant environmental effects or involve

unique or unknown environmental risks." 43 C.F.R. § 46.215(d).  Specifically, ONDA maintains

that the proposed "maintenance activities would either create or upgrade" the roads and that

"BLM never undertook any project-specific nor cumulative analysis of the approved road work

Page 29 - OPINION AND ORDER

on sage-grouse populations and habitats across the three million acres of sagebrush habitats at issue." ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 29.  BLM responds that it properly concluded that, for each CX, this extraordinary circumstance did not apply because the roads already existed and, as discussed above, none of the information in the administrative record identifies "maintenance or even the existence of secondary roads as threats to sage-grouse." BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 40.

I find that, with regard to each CX decision, BLM adequately assessed whether its proposed action had uncertain effects or risks and did not act arbitrarily or capriciously in determining that the extraordinary circumstance did not apply.  As discussed above, ONDA's repeated argument that the CXs authorize construction or upgrading of roads is inconsistent with the language of the CXs themselves, which specifically state that maintenance is limited to already-existing roads.  Moreover, although ONDA is greatly concerned with the impact to sage-grouse habitat, BLM's determination that secondary roads would not impact sage-grouse is reasonable in light of the information in the record.  Accordingly, I find that BLM did not act arbitrarily or capriciously when it determined that 43 C.F.R. § 46.215(d) did not apply to the six CXs at issue.

### C.    Improper Segmentation

Next, ONDA contends that "BLM improperly segmented its environmental analysis by splintering the authorizations into six separate decisions, each devoid of any real environmental analysis." ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 29.  ONDA contends that, under 40 C.F.R. § 1508.25(a), the proposed road maintenance in the CXs constitute "connected actions" as they are independent parts of BLM's larger, district-wide

programs relating to cattle grazing and route maintenance. Thus, ONDA maintains that, under

40 C.F.R. § 1502.4(a), BLM should have viewed all of the proposed actions as a single course of

action in determining whether an EIS was required. Given that the proposed actions, when

viewed together, "sweep in hundred of miles of routes," "affect hundreds of thousands of acres of

important sagebrush habitat areas," and "affect a single biologically-defined sage-grouse

population," ONDA maintains that the proposed actions "significantly" affect the environment,

thereby requiring BLM to prepare an EIS. ONDA's Reply in Support of Motion for Summary

Judgment, #47, at 25.

      In response, BLM argues that the actions authorized in the six CX decisions are not

connected because each action has "independent utility and does not depend on any other CX."

BLM's Memo. in Support of Cross Motion for Summary Judgment, #45, at 41. Moreover, BLM

notes that the Ninth Circuit recently held that 40 C.F.R. § 1508.25(a)(1) "has no application to

Categorical Exclusions," *id.*, and ONDA cannot rely on 40 C.F.R. § 1502.4(a) as "an independent

test for determining when to study related actions in a single EIS." BLM's Reply in Support of

Cross Motion for Summary Judgment, #54, at 37 (quoting *Pac. Coast Fed'n of Fishermen's

Ass'ns v. Blank*, 693 F.3d 1084, 1097-98 (9th Cir. 2012)) (internal quotation mark omitted).

      For the reasons set forth in BLM's memorandum in support of its cross motion for

summary judgment and its reply brief, I agree that ONDA's improper-segmentation claim fails.

Under 40 C.F.R. § 1508.25(a)(1), an agency must prepare a single EIS that addresses all

"[c]onnected actions," including actions that "[a]re independent parts of a larger action and

depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). As BLM notes,

however, this provision is inapplicable when an agency invokes a CX. *See Ctr. for Biological*

Page 31 - OPINION AND ORDER

*Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013) ("[W]e conclude that section 1508.25's requirements do not apply to BLM's categorical exclusion analysis . . . ."). In any case, I agree with BLM's argument that each CX authorizes actions independent of actions authorized by the other CXs—that is, each CX has independent utility.

### D.    Summary

For the reasons set forth above, I find that BLM did not act arbitrarily or capriciously when it determined that an EIS was not required for the road maintenance authorized by each of the six CX decisions at issue. Accordingly, I grant BLM's cross motion for summary judgment to the extent it requests judgment in BLM's favor on ONDA's NEPA claim.

### V.    FLPMA Claim

Finally, ONDA contends that the challenged CX decisions violate the resource-management plans for the Andrews Management Unit and the Three Rivers Resource Area. Specifically, ONDA claims that the "mechanical maintenance" authorized by the six CXs "will fragment and damage sagebrush habitat, in violation of the land use plans' requirements that BLM conserve and protect the [g]reater sage-grouse and manage sagebrush habitat for the benefit of the sage-grouse." ONDA's Memo. in Support of Motion for Summary Judgment, #33, at 31. In response, BLM first argues that the resource-management plans for the Andrews Management Unit and the Three Rivers Resource Area both provide for maintenance of roads and, thus, the proposed road maintenance at issue in the six CXs is not inconsistent with the resource-management plans but, rather, implement those plans. Second, BLM argues that "ONDA ignores that BLM must protect sage-grouse and its habitat within the context of multiple use/sustained yield management" and that protection of sage-grouse is just one of BLM's "'competing priorities'

in its land management." BLM's Memo. in Support of Cross Motion for Summary Judgment,
#45, at 42. Specifically, BLM notes that it must also manage the land "so as to provide a
sustained level of livestock grazing" and to aid in the suppression of wildfires. *Id.* at 43 (citation
omitted) (internal quotation mark omitted).

"Under FLPMA, BLM has 'a great deal of discretion in deciding how to achieve'
compliance with [a resource-management plan]." *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230, 1235 (D. Or. 2013) (citation omitted). In this case, I cannot conclude that
BLM's maintenance of already-existing roads violates the applicable resource-management plans.
ONDA ignores BLM's duty to manage the land for multiple uses, including grazing and
protection against wildfires. Moreover, as BLM notes, each of the applicable resource-
management plans specifically provides for road maintenance. Accordingly, I find that BLM did
not act arbitrarily or capriciously when it determined that the road maintenance authorized by the
six CXs complied with the resource-management plans for the Andrews Management Unit and
the Three Rivers Resource Area. Consequently, I grant BLM's cross motion for summary
judgment to the extent it requests judgment in BLM's favor on ONDA's FLPMA claim.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, ONDA's motion for summary judgment (#32) is denied, BLM's motion to strike extra-record evidence (#40) is denied as moot, BLM's cross motion for summary judgment (#44) is granted, and ONDA's motion for leave to file a surreply (#58) is granted. A final judgment should be prepared.

Dated this 29th day of April, 2014.

Honorable Paul Papak
United States Magistrate Judge